Good morning. May it please the Court, I'm John Campbell. I'm here on behalf of Kroeschell Engineering. I'm the employer appellant in this case. Good morning, Mr. Nierman. We appeal this Circuit Court decision that reversed a Commission decision on manifest weight. The incident that occurred in this case is not necessarily in question. We know Mr. Pittman is a man working for Kroeschell that tripped and fell to his right knee in January of 2010. I say the incident is not in question, but whether or not there was an accident is in question. I'm sorry, I should say whether or not there was an injury. We can call the accident. We'll give you that. Was he injured? And more importantly, was he injured to the extent that it caused the need for a knee replacement that was subsequently had about four months later? There is quite a bit of debate as to the severity, because this is a gentleman who, when he tripped and fell, got up and continued working. It was toward the end of the work day anyway. But he didn't report an accident or injury when it occurred. He didn't ask for immediate medical care. He signed up. You start out by saying, is it correct? There is no dispute that he had a work-related accident. I meant, is there? Yeah. No, I can't say accident. I meant to say I misspoke. When I say an incident or accident, we'll call those the same thing. Something happened. He fell. Injury is a bigger leap. He fell. Nobody disputes that. Exactly. Okay. So this case goes to the severity of that incident relative to significant preexisting treatment and the condition of that knee joint. And nobody disputes. The other side has not disputed that he had a preexisting condition, have they? No. Correct. And, in fact, the Commission cited those records. The basis for the Commission decision was this gentleman had significant preexisting degenerative late-stage degenerative arthritis in his right knee and that that knee needed to be replaced before this incident ever occurred. Let's assume that's all true. Right. Was the claimant asymptomatic before this date? He was not. He was not? No. I think that's a serious dispute here. Well, I  How did he get a preexisting condition? He had no assistance. He never missed a day of work. Let me draw your attention to two things. One, the treatment records of Dr. Petrucci that show as recently as six weeks before this incident occurred, he had his most recent injection into the knee to mask the pain that he was having for years. That's what the whole case turns on. Exactly. That's what the circuit court was concerned about. I agree. And I think that's true. The injections were working. Your expert acknowledged that. Okay? So if he's asymptomatic, he's having no problems, he's got a preexisting condition, he falls and all of a sudden he's got these symptoms and he needs surgery, how can you say the accident was not causally connected to the aggravation? Well, for one, I have Dr. Kornblatt's opinions and I'll get to those in a moment. Let me point to something more persuasive, I think, Judge, which the commission is relying upon. Those records, you need a new knee, you need a knee today, you need it in six months, whenever you need it, it needs to be replaced. And a relatively innocuous fall to the knee is not the cause for that condition. However, let's look at his own testimony. Mr. Pittman testified, one, he has pain every day. That's not asymptomatic. And this is page 76 to 83 of the record. This is my cross-exam. Pain every day, pain getting up out of a chair, pain with stair use. But yet he's working all the time and there's no pain. I understand he's working. But does it matter? To say it doesn't matter, it matters tremendously that he had such symptoms that he was having injections, upwards of 20 in the knees, and treating for years before this, and was told his knee needs to be replaced. That is tremendously significant. Okay, so let's assume it did, definitively. It could have been two or three years, nobody knows. Right. So he has the accident, all of a sudden he has an immediate need for surgery, or he didn't before the accident. You're saying, basically you're saying it's not related to the work injury. So bad, too bad, right? It has to be your position. He needed a knee replacement anyway, so anything that happens in the meantime doesn't matter, according to you. Yes, but let me add something to that argument. I do agree with that, but I'll take it to the point of absurdity and draw a distinction. Again, I want to point to the relative modest or benign nature of this incident. The man wrote on a sheet at the end of his workday that he did not have an accident or injury. No, we don't know that. That was disputed, wasn't it? No, no, no. He did write it. The testimony was he could have done it at the beginning of the shift that was conceded by the supervisor. That's correct. He also acknowledged that he had every opportunity to revise that before he submitted it at the end of the day, and he didn't know if he wrote it at the beginning of the day or at the end. He said he could have, and he had the opportunity to change that. And he testified he did have the opportunity to modify that if he made an earlier statement, written statement. Yes, Your Honor, he did have that opportunity to make that change. He did, but who said he did? I believe both the one of the coworkers that testified, Mr. Pollack, as well as Petitioner acknowledged that he had an opportunity to change that. So it's not turned in at the beginning of the day. These are turned in at the end of the workday. Did he complete it earlier? I don't think he knows for sure. Didn't he testify he did complete it earlier? That he didn't? I'm sorry. Didn't he testify that he did complete it at the beginning of the day? I don't know. I think at first he said it, but then I think later he said he wasn't quite sure when exactly he did, but he did say that he had the opportunity to correct that. And certainly if you had a serious enough injury to a knee that required immediate care, you would say something to someone at minimum and maybe go back to these cards, which is not new to them. They sign these things off every day. His testimony was after the fall, what symptoms did he experience after the fall? What did he actually testify to?  Swelling and symptoms. Swelling was chronic and he had it well before. He also testified to swelling after. That's true. The measure of that swelling, I don't know that anyone can determine or distinguish the difference, because that was a symptom that's chronic based on his own testimony that he had chronic swelling in that knee joint because it was in such bad shape. Was pain considered in this case chronic condition as well? Well, his pain was because he testified it was every day before the incident. And that's in the medical records, too. This isn't just based on a cross-exam of a claimant. There are several years of records in Fox Valley orthopedic records that substantiate this. That's the basis of the commission decision in a large extent. They say it in black and white that it's based on the medical records, and that's why they rely on it. You need a new knee, you had a relatively innocuous fall that didn't compel you to seek immediate care or report it that day. Was it a mistake? I know Mr. Pittman said, oh, it's a mistake, I should have changed it. Well, you didn't, and at this point we can't, we can only go with what we have in evidence. And the gentleman said he did not report an incident or accident that day. He felt the pain later that night. But frankly, this is a man who had pain every single day. And yet he never missed any work at all. That's not disputed, right? No. You mean because of the knee before that? Other than in the past when he had surgeries and things, but not leading up to this is probably your question. Did he do his job that day? Did his job, didn't take any time off, didn't need any assistance at work to do his job, did he? Personal assistance, no. There was no testimony about him needing personal assistance. Okay. Until the day of the accident. Right. Until after he fell on his knee. Okay. Right. What did this gentleman do? In the arbitrator's decision it says lighting maintenance, but I didn't see anything in the briefs regarding what his actual job was. It is, we'll call it light maintenance work. Anything more detailed, he did change a lot of light fixtures. So not to oversimplify it, I'm sure there were some other light maintenance type duties, but that was a primary job duty at this facility. They were working on site at a customer. Not a lot of bending. More standing and replacing overhead light bulbs. That is my understanding. Yes. That is my understanding. But to get back, two points. Let's remember today, we're here on manifest weight reversal. And it is not for the circuit court or for any court after the commission level to rehash the facts necessarily. If there is a reasonable evidentiary basis for the conclusion of the commission, it should be affirmed. I'll spare you the resuscitation of case law. This court certainly has restated that rule as well as the Supreme Court. And in this case, the commission cites a longstanding knee condition, demonstrating the knee joint needed to be replaced, and specifically says Dr. Chudnik, who was the more recent treating physician. He didn't go to the doctor he had for the last 10 years. He went to a new physician. He says, well, his opinions supporting causal connection here are not as credible because, one, the first statement he made to Dr. Chudnik was that his right knee was asymptomatic. That's in the first record to Dr. Chudnik. And the commission noted that. And secondly, Dr. Chudnik had not reviewed all of those Fox Valley records. Didn't have those. When we cross-examined Dr. Chudnik in his testimony, he acknowledges, yeah, let's assume I didn't have those records. He didn't have any idea how bad that knee joint was. Of course he identified it. He's an orthopedic surgeon. He certainly was aware that there's an arthritic knee there. Okay. But he had no idea the extent that this gentleman was suffering in dealing with this. He was masking the pain with injections. That doesn't mean he didn't need a knee replacement. And I submit to you that the commission had a reasonable basis based on quite a bit of evidence from Fox Valley Orthopedic. This man's knee was in really bad shape. And to rely on those records to say, you know what, you had a contusion and you fell. But the knee replacement was needed long before that, and that's their decision. And that is a reasonable basis. And let's go back to the relative severity of the incident, too. Dr. Quamblack describes that. He said, well, doctor, hey, there was an indication of like a PCL tear in the knee. Well, what of that? How could that not be the cause? And he says, well, first of all, this man's knee was so degenerated you would find those in diagnostics regardless. And this gentleman did not have any bruising. He did not have any abrasions. Certainly didn't have any fracture when he fell. And he didn't seek immediate care. So Dr. Quamblack explains, relatively speaking, this is not severe enough of an incident to cause this. If there were a spiral fracture of the shin and the knee got twisted into a pretzel, something horrific that we do see sometimes, my argument would be much tougher. I would probably still be here arguing that once you need a new knee, you need a new knee. However, that was where I wanted to go. You would still take and make that argument, even if those other facts? If it was a spiral fracture, well, I would submit to you I would have a much more difficult argument before you here today. It would depend on the details. The devil's always in the details. But I think I could make a valid argument that once you need a medical treatment for something, you don't magically not need it anymore. So is that a correct statement of the law? Your position has to be if he didn't need surgery before the accident and the accident caused the claimant to need surgery sooner than he would have before the accident, you're saying there should be no recovery. He had a bad knee. He needed a replacement at some point. So whatever else happens at work shouldn't matter because he needed a new knee anyway. That seems to be your argument. It is to a large extent, and I would agree with that. Is that a correct statement of the law, however? Well, I think it's more fact than law. But the injury accelerates the need for surgery. I suggest that's not a correct statement of the law. I'm sorry? If the injury accelerates the need for surgery, I'm suggesting that's not a correct statement of the law. It doesn't matter if he needs a new knee at some point. Okay. And again, my argument very much is that he needed a new knee in the years that preceded him. I agree with that. I think your opponent agrees with that. Okay. But if that's the case, it's not whether or not he may someday need a new knee. It's whether or not that knee could have been replaced at any point since 2006 to 2010, and the answer is yes. He himself in December of 2006 said he wanted it. But he didn't need to because the hydrolytic injections were working. Okay. According to everybody. Injections. Why were the injections discontinued? I don't know that Dr. Chudnick explained it, other than all those injections were from Dr. Petrucci's care at Fox Valley, and then after this incident, he moved his treatment to Dr. Chudnick, and that's when they more quickly moved from, I think, the first exam. Well, the record seems to reflect that after the accident, both Petrucci and Chudick or whatever his name is, recommended that he discontinue the injections and undergo surgery. Now, I'm looking at Kornblatt's testimony, and I wonder if the testimony really points to the argument that his accident aggravated his condition, thus requiring the operation, or if merely he always needed the operation, but the injections were masking the pain, and for some reason, the doctors recommended no more injections, and once they did, the pain was uncontrollable and he needed the operation. And Kornblatt seems to suggest that it had absolutely nothing whatever to do with the fall. Well, and I'm seeing, and I tag this in Kornblatt's testimony, and I don't have your record citation. I apologize. Page 15 of the transcript. In summary, he's saying, look, he had an injury. He fell. It was a relatively minor contusion. And that he had end-stage arthritis, and he required a total knee replacement prior to the injury. That's page 15. So I'm summarizing what is the essence of at least what I'm citing for support for the fact that this man already needed this to be done. Could there be a need? He came out with an opinion that said, quite frankly, the claimant's need for a total knee replacement was completely unrelated to his work accident. Yes. Due to the relative, in his opinion, innocuous nature of the incident, citing no abrasion, citing no bruising. Now, is it my, am I corrected to understand that before this accident, but for the injections he was getting, the pain was so severe he would have had to have a knee replacement anyway, right then and there. Before he fell to his knees? Before the accident. Did the injections, the injections mask the pain to the extent that he didn't need a knee replacement at that point in time, and when the injections were withdrawn he needed them? I think that's a fair statement. The question we don't have is could he have continued injections indefinitely? Probably not. Could he have continued injections for another year? Well, do we know why, do we know why the recommendation was made by both of his doctors to stop the injections? I don't, off the top of my head, I don't know why they decided to move to surgery other than he was a candidate for knee replacement. But wouldn't the accident then, of logic and necessity, have something to do with their taking him off the injections and saying now you need surgery? I don't believe so, and I don't think the evidence supports that. Is it a coincidence that after the accident they took him off the injections? Okay, but that's, it's independent of the condition of this knee. If I was up here and the gentleman had no prior treatment and we simply uncovered a degenerative condition, it may be more persuasive for there to have been a reversal on manifest weight here. But this man needed a knee. They're injecting his knee to mask the pain he would otherwise have. And by the way, even with injections, he says he has pain every day, pain with day-to-day activity. But the point was the man was doing his job. You have not disputed that or pointed to anything that says he wasn't doing his job. Right. Okay. But again, I'll finish. I think I've made the points I want to make. You understand our position. Again, the focus here is whether or not the circuit court judge could have interpreted Dr. Chudnik as more persuasive is not really the measure that I need to meet here. I think the measure is whether or not there was a reasonable basis for this decision. There is, based on the prior treatment records, based on the Berry case I've cited, and I ask for a reversal and reinstatement of the commission decision. Thank you. Thank you, counsel. May it please the court and counsel, the question is the need for the knee replacement. And the reality is that by the admission of both the treating physician as well as the independent medical evaluator, there's no need for a knee replacement when the hyaluronic acid injections are working. And in this patient, we had four years of success, increasing success. I mean, the first injection lasted five months, second, six, third, seven. I think the last was up to nine months. That's an incredible positive result from treatment. Justice Hoffman's question, I think, is maybe you can answer it. Sure. This was all with the shots that he was taking. Correct. And over a period of time, he was able to perform his work. Correct. After this incident, he's no longer taking those injections. Right. Is there any explanation for that, or is that the reason that he's experiencing this pain when he's accelerating into a knee replacement? Well, I don't know that anybody specifically addressed that, but we can look at the facts of the case and we can see that on imaging tests, we have a brand-new PCL tear. The posterior cruciate ligament is torn. It's a high-intensity finding on that test showing it's a fresh tear. We have a brand-new tear of the MCL from this accident. That's another high-intensity finding on the scan. We have objective proof there were structural changes within the knee. We have the client testifying his instability in the knee was now an issue. We have the need to use a cane or a walker or whatever he was using, some assistive device. But he didn't before. Correct. He was completely functional before the accident for a period of years. The fact that a doctor six years earlier was able to take the injections so now it's not so his dysfunctionality, so to speak, and the need for assistive devices is because there's no longer a script for those injections or? Yeah. No, I understand. That would be a good argument for counsel to make, I would think. But the nature of these injections, all they do is operate as a shock absorber. You know, you stick a little gel in the knee and it prevents the bones from scratching on each other and wearing each other down. So the fact that they're working, it's just like an assistive device. The fact that someone's using an assistive device to get around and do the work. Why were they stopped? They were stopped because now he had instability. He had severe pain after the swelling occurred by the end of the night. And he had two fresh tears. Well, Cornblatt said he didn't have any tears. Cornblatt's testimony was that it was nonsense. The radiologist didn't properly read the film. And they were mistaken for an inflammation of existing tears. Right. The problem with Cornblatt's opinion is that he did a couple of crazy things. He will not concede a concept unless it's 80 to 90 percent probable. So he applies the wrong probability standards to his analysis of the case. He admits it. And they don't go back and fix it. I'm curious about that point. I've not seen a quantitative range placed on what a reasonable degree of medical certainty is. But you say it's wrong. Yeah. What's your point of reference? Well, my point of reference is more likely than not. He even concedes it because I ask him before, I ask what is he applying to this case and his causation analysis. I ask him, what's the standard that we're dealing with here, doctor? And he's been around forever. You guys have seen him in other cases. He knows it's more likely than not, 49-51. And he tells us still he's applying an 80 to 90 percent. In this case? Yeah. Yeah. Well, probably. Who knows what he's applying to any other case? With respect to the issue. But hold on. I want to get back to Justice Harris's point. Yeah. Do you really think that within a reasonable degree of medical certainty means 51 percent? Absolutely. Why? Because that's the standard. Because I'm certain about that. It's more likely true than not true. But it's certainly not certain. But isn't that the standard that we apply to determine whether or not someone wins their case? Well, no, no. But that's entirely different. That's entirely different. That's the standard of proof that you have to meet in order to win your case. That's not necessarily the standard to be applied to the certainty of a medical opinion. Now, when one says something is more likely true than not true, that certainly doesn't rise to the level within a reasonable degree of certainty. Certainty is not 51 percent. Certainty is you tip the scale. I haven't seen the case. It's better than a guess. I haven't seen the case that says that. Well, maybe you're going to. I hope you don't say that in this case. But, you know, the only thing that I'm telling you is I don't know of a case that says within a reasonable degree of medical certainty is 51 percent, more likely true than not true. I've never seen that case. But if we're looking to prove a case to a certain degree of probability and we're asking the answer. No, no. You only have to prove the case by a preponderance of the evidence. Correct. The opinion of the doctor is some of that evidence. The question is what's the basis of the opinion? Is the opinion any good? Okay. Well, then the follow-up to that, is that opinion now admissible? Is that probative of anything? Well, I have to prove myself.  But not the basis of the opinion because he's applying a standard which requires me to prove a connection to an 80, 90 percent confidence level. No, no, no, no. Yes, all you have to do is produce a witness that says within a reasonable degree of medical certainty there is a causal connection. He turns around and says there is not. And the commission makes the decision as to who they're going to believe.  And then if they believe your witness, you've proven your case by a preponderance of the evidence. Right, right. No, I get it. Well, does the case really turn on that, though? No, it doesn't. It doesn't. Didn't the commission in reciting their findings specifically say the surgery was postponed, the right knee was being treated with a series of injections, the medical records, I quote, reveal he was able to live with the pain and discomfort until January 25th, 2010? Until the accident. Exactly. They stated the standard, but they ignored the acceleration in the but-for principle of law. Exactly. They didn't say anything about we believe Kornblatt over so-and-so. Right. They ignored the doctors, actually. They ignored the evidence, basically. Yeah, essentially. And they ignored the standard. So what I would ask is that you reverse, or no, that you don't reverse, that you uphold the circuit court's ruling because... You don't ask to reverse the circuit court, do you? Please don't reverse the circuit court. All right. Thank you. You may reply. Thank you. Counsel is pointing out that the injections were so helpful that they were farther apart, but the truth is Dr. Chudnik testified himself that an arthritic condition does not get better, it only advances. So this gentleman's knee is continuing to get worse for years prior to this incident. All right. And as for the commission decision, I don't know that they ignored the standard. I'm looking at page 2. Well, they didn't. They seem to recite the facts that everybody agrees on. Let me read this line because it is important. Again, with manifest weight, do they have a reasonable basis? Commission finds these injections only postponed petitioner's total knee replacement surgery, but did nothing to ameliorate the need for the surgery. And we agree with that. The question is, did the injury accelerate the need for the surgery? It's not the question if it didn't cause it. We know it didn't cause it. The issue is, did it accelerate? And if it accelerated it, you're stuck with it. If you already need something. Yes. And you're just not having it. Yes. A subsequent incident that may or may not have accelerated that need doesn't necessarily mean it's the cause. You already need that treatment. It's already necessary. Well, it may be necessary, but it may not be necessary today. It may not be necessary for five years. But because of an event, it becomes necessary tomorrow. You're responsible for it under the act. It is a cause of that condition at that point in time. And that's the accelerated condition. What of the relative innocuous nature of this trip and fall? Well, that was for the commission to decide. And they said there was, according to them, there was a temporary aggravation. Sure. Temporary aggravation. Exactly. A temporary aggravation. Not an acceleration. He already needed the knee replacement. It's a temporary aggravation. That means you didn't advance it. He could have chosen to have that knee replacement the day before, the day after, five years before. He could have chosen. The question is, did the event necessitate it earlier than it would have been necessitated otherwise? I don't believe so because it was already a recommended treatment that he could have had at any time. But one day he's working with no problems. He hasn't missed a day of work for years. The next day after he falls, he needs the knee replacement. How could you say that the fall had nothing to do with accelerating the need for surgery? Because he already needed that knee replacement. Okay. Because it was already needed. And that is the commission's basis. And there's case law behind that. There's case law behind that. I cite the Berry decision as well as some of the, I understand, commission decisions are not presidential. Let's not go down that. Right. I understand that. But it wouldn't be the first time they point to a condition that needs a reasonably innocuous or benign type of incident to say that didn't do anything to trigger the treatment that was already needed. I think that's a fair summary of the commission decision. It's reasonable. And I think it should be reinstated because it's not against the manifest way of the evidence in this case. Thank you. Thank you, counsel. Both this matter will be taken under advisement.